UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CURTIS TURNER and TYRONE ST. JOHN, | ) | |
| | ) | |
| Plaintiffs, | ) | 17 C 4023 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| THE AMERICAN BOTTLING COMPANY, DR PEPPER SNAPPLE GROUP, INC., DR PEPPER SNAPPLE BOTTLING GROUP, INC., and DR PEPPER/SEVEN UP, INC., | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Curtis Turner and Tyrone St. John bring this suit against their former employer, The American Bottling Company, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.*, alleging that they were fired due to their race and age. Doc. 23. (There are other defendants, but they may be ignored for present purposes.) Discovery ensued, and American Bottling moved to bar Plaintiffs from relying on certain parts of Turner's deposition testimony. Doc. 55. The court entered and continued the motion, noting that it would address the matter if Plaintiffs attempted to use the disputed testimony on summary judgment or at trial. Doc. 60. American Bottling now moves for summary judgment. Doc. 71. Because Plaintiffs cite the disputed testimony in opposing summary judgment, American Bottling renews its motion to bar, and also moves to strike portions of Plaintiffs' Local Rule 56.1(b)(3)(B) response. Doc. 87. The summary judgment motion is denied, the original motion to bar is denied as moot, and the renewed motion to bar and strike is denied in part and denied as moot in part.

1

**Background**

A few preliminary issues before turning to the facts. First, where American Bottling's denials of assertions in Plaintiffs' Local Rule 56.1(b)(3)(C) statement of additional facts merely establish genuine factual disputes, Doc. 86 at ¶¶ 1-5, 8-10, 13, 31-32, 42, those disputes are resolved in favor of Plaintiffs, the nonmovants. *See Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018). Second, the court will disregard the portions of American Bottling's response to Plaintiffs' Local Rule 56.1(b)(3)(C) statement, Doc. 86 at ¶¶ 2, 4-6, 10, 19, 21, 34, 52, 59, 65, that present legal arguments inappropriate for a Local Rule 56.1 submission. *See Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015) ("[D]istrict courts are not required to wade through improper denials and legal argument in search of a genuinely disputed fact.") (internal quotation marks omitted); *Sys. Dev. Integration, LLC v. Comput. Scis. Corp.*, 739 F. Supp. 2d 1063, 1068 (N.D. Ill. 2010) ("[T]he purpose of [Local Rule 56.1 submissions] is to identify the relevant evidence supporting the material facts, not to make factual or legal arguments, and thus the Court will not address the parties' arguments made in their [Local Rule 56.1 submissions].") (citation omitted).

Third, American Bottling's motion to strike portions of Plaintiffs' Local Rule 56.1(b)(3)(B) response is denied to the extent it argues, as to ¶¶ 61, 78, and 79, that Plaintiffs may not rely on their own testimony to contest American Bottling's account of what they said during its investigation into their alleged workplace misconduct. Doc. 87 at ¶ 6. American Bottling neither develops nor cites any authority for its position, thus forfeiting the issue. *See M.G. Skinner & Assocs. Ins. Agency v. Norman-Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority."). In any event, American Bottling's argument fails on the

merits because settled law holds that a nonmovant's testimony may create a genuine factual dispute on summary judgment. *See Hill v. Tangherlini*, 724 F.3d 965, 967 & n.1 (7th Cir. 2013) (overruling cases suggesting that a plaintiff's "self-serving" testimony is insufficient to create a genuine factual dispute); *Paz v. Wauconda Healthcare & Rehab. Cent., LLC*, 464 F.3d 659, 664 (7th Cir. 2006) ("We have long held that a plaintiff may defeat summary judgment with his or her own deposition.").

The following facts are set forth as favorably to Plaintiffs, the nonmovants, as the record and Local Rule 56.1 permit. *See Johnson*, 892 F.3d at 893. On summary judgment, the court must assume the truth of those facts, but does not vouch for them. *See Donley v. Stryker Sales Corp.*, 906 F.3d 635, 636 (7th Cir. 2018).

### A. The Key Players

Turner, an African-American man who was nearly 47 years old at the time of his firing, worked from 2012 through 2015 as a production manager at the American Bottling facility in Northlake, Illinois. Doc. 78 at ¶¶ 1, 3, 16. St. John, an African-American man who was 48 when he was fired, worked at the Northlake facility from 2008 through 2015, initially as a supervisor, then as a production manager, and finally as a maintenance manager. *Id*. at ¶¶ 2-3, 12-13, 15, 18. Turner and St. John first worked together at a plant in Williamson, New York, where they started in late 1997 alongside Daniel Graham, a white man who years became plant manager at the Northlake facility. *Id*. at ¶¶ 9-11.

In 2008, Graham offered St. John a supervisor position at the Northlake facility, and St. John transferred there from the Williamson plant. *Id*. at ¶¶ 12-13. The next year, St. John was promoted to production manager with Graham's support. *Id*. at ¶ 15. In September 2014, again with Graham's support, St. John made a lateral move, which came with a raise, to

3

maintenance manager. *Id*. at ¶ 18. In 2012, Graham hired Turner as a production manager at Northlake. *Id*. at ¶ 16. During his time at Northlake, Turner received two or three raises, which Graham supported. *Id*. at ¶ 17.

Aside from Plaintiffs, all managers at Northlake were white. Doc. 86 at ¶ 68. Among those other managers was Bogdan Jaba, who ultimately was fired along with Plaintiffs. Doc. 78 at ¶ 3. Jaba is Romanian, speaks with an accent, and was 41 years old when he was fired. *Id*. at ¶ 101; Doc. 86 at ¶ 65.

B. **Plaintiffs' Terminations**

The facts surrounding Plaintiffs' terminations are complicated and hotly disputed. For summary judgment purposes, it suffices to set out the rough outlines of Plaintiffs' version of events to the extent it finds support in the record. Plaintiffs and Jaba were fired on November 24, 2015, following an investigation by Samantha Hughes, a human resource ("HR") manager at the Northlake facility, and Leon Ferguson, an HR director based in Texas. Doc. 78 at ¶¶ 36, 73, 80; Doc. 73-11 at 95. All three received termination letters signed by Graham and giving this explanation:

> As a result of a recent investigation into the hiring of two (2) employees, it has been confirmed that you violated the Dr Pepper Snapple Group Code of Conduct in response to your responsibilities and accountabilities as [a] Manager at the Northlake Plant facility. You failed to follow established guidelines and practices regarding the interviewing process. As a result of your involvement, you failed to comply with our Code of Conduct and fulfilling your obligations and meeting my expectations and those of the Company as a manager in my organization.

Doc. 73-11 at 61-62, 64; Doc. 78 at ¶ 80. The two employees whose hiring was investigated were Vernell Sanders—the stepsister of St. John's stepbrother—and Melvin Sellers, her significant other. Doc. 78 at ¶ 33; Doc. 86 at ¶ 1. St. John referred Sanders and Sellers for open

4

positions at the Northlake facility. Doc. 78 at ¶ 35; Doc. 86 at ¶¶ 3-4. Turner hired Sanders, and Jaba hired Sellers. Doc. 78 at ¶¶ 45, 49.

Graham decided to fire Plaintiffs and Jaba during a conference call with Hughes, Ferguson, Fernando Cortes (then the senior vice president of supply chain), and Stan Wood (vice president of human resources) the morning of November 24, 2015. *Id*. at ¶ 75; Doc. 86 at ¶¶ 8-9. After Hughes and Ferguson walked through the findings of their investigation, Graham recommended firing Plaintiffs, and Cortes indicated his approval. Doc. 86 at ¶ 9. Cortes testified that although he had the authority to fire Plaintiffs and had approved Graham's recommendation, it was Graham who ultimately made the decision. *Id*. at ¶¶ 9, 12.

As to the justification for firing St. John, Graham testified that St. John violated American Bottling's hiring practices (1) by failing to disclose to Graham and HR that Sanders and Sellers were "folks that he knew" and "[p]otentially relatives," and (2) by improperly influencing Turner and Jaba to hire Sanders and Sellers. *Id*. at ¶ 14; Doc. 84-7 at 3-4. Graham testified that he formed the latter belief based on Turner's statements to Hughes and Ferguson regarding the circumstances of Sanders's and Sellers's hiring. Doc. 86 at ¶ 14; Doc. 78 at ¶ 79; Doc. 73-11 at 33-34. But the interview in which Turner told Hughes and Ferguson that he had felt pressure to move forward with the hiring process (but not specifically to hire Sanders and Sellers) happened after the November 24, 2015 conference call in which Graham decided to fire Plaintiffs. Doc. 78 at ¶ 79; Doc. 86 at ¶¶ 8, 10-11; Doc. 73-11 at 33-34. Graham also testified that he fired St. John for being untruthful during the investigation by failing to admit that he had pressured Turner and Jaba about the hirings. Doc. 86 at ¶ 14.

As to the justification for firing Turner, Graham testified that Turner violated American Bottling's hiring practices (1) by interviewing Sanders by phone instead of onsite and (2) by

5

allowing St. John to influence the hiring process. *Id*. at ¶ 15. Graham also claimed that Turner was untruthful during the investigation, in that Turner admitted only in his final interview with Hughes and Ferguson that he had felt pressured by St. John. *Ibid*. Graham gave similar reasons for terminating Jaba, with the added concern that Jaba violated American Bottling's hiring practices by hiring Sellers without interviewing all candidates for the position in question. *Id*. at ¶ 16.

Plaintiffs dispute Graham's explanations, contending that he authorized the conduct into which he later launched an investigation and upon which he ultimately based the terminations. Doc. 79 at 6; Doc. 86 at ¶¶ 3, 7, 31. St. John testified that in May 2015, before Sanders and Sellers applied for positions at the Northlake facility, he told Graham about his relationship to them—and specifically that he shared a stepbrother with Sanders—and that Graham told him to "go ahead and have them apply." Doc. 86 at ¶¶ 2-3. And Turner testified that Graham gave him permission to interview Sanders and Sellers by phone rather than onsite because they lived in North Carolina. *Id*. at ¶ 31. Turner also testified that he explained to Hughes his understanding of the relationship between St. John and Sanders—that Sanders was St. John's stepbrother's stepsister—and testified that he had received Hughes's approval to call Sanders to determine whether she was related to St. John "by blood." *Id*. at ¶ 32. (Sanders confirmed that she and St. John were not related by blood. Doc. 78 at ¶ 56.)

Graham requested the investigation on November 16, 2015 after a conversation in which St. John told him that Sanders had been hired. Doc. 78 at ¶¶ 52-53; Doc. 73-15 at 4. In that conversation, Graham asked St. John, "[W]hy didn't you tell me about your sister before?" Doc. 78 at ¶ 52. St. John replied, "[W]e have talked about this or you would not have known she was related." *Ibid*.; Doc. 73-15 at 4. After that conversation, Graham brought Sanders's and

Sellers's hiring to Hughes's attention. Doc. 78 at ¶ 52; Doc. 86 at ¶ 7. Hughes and Ferguson led the investigation. Doc. 78 at ¶ 53. It is unclear from the record what Graham told the investigators; there is no indication that he acknowledged knowing about or authorizing the conduct that was being investigated.

Hughes prepared rough transcripts of the interviews she conducted during the investigation, but the parties dispute whether she took contemporaneous notes at every interview. *Compare* Doc. 78 at ¶ 68 (American Bottling asserting that she did, but citing testimony addressing only her interviews with Turner, Doc. 73-6 at 13; Doc. 73-8 at 34), *with* Doc. 78 at ¶ 68 (Plaintiffs denying American Bottling's assertion as to interviews other than Turner's, and citing St. John's testimony that Hughes did not take notes during his interview, Doc. 84-2 at 30). Plaintiffs contend that Hughes's notes include some things that Plaintiffs never said and omit some things that they did say. Doc. 78 at ¶¶ 61, 68, 78; Doc. 84-2 at 31-33; Doc. 84-5 at ¶¶ 1-2. The forms to which Hughes appears to have attached her notes include places for both her and the interviewee to sign, but only she signed them. Doc. 73-11 at 8-35.

Graham ultimately replaced Plaintiffs with two white men from an "emerging leader" program he supervised—one in his late 20s, and the other in his early 30s. Doc. 86 at ¶¶ 52-54, 56-57. Both had started at Northlake in Summer 2015. *Id*. at ¶ 57. Jaba was replaced by a white man younger than 40 and not from a foreign country. *Id*. at ¶ 55.

In a letter dated December 8, 2015, Turner sought an investigation into his termination, explaining that he had followed the proper hiring process. Doc. 78 at ¶ 84; Doc. 73-10 at 3-5. Turner acknowledged that St. John had sometimes described Sanders as his "sister," but wrote that both St. John and Sanders had explained that she was not St. John's "blood sister" or stepsister. Doc. 78 at ¶ 84; Doc. 73-10 at 3. Turner did not say whether he had provided that

7

information to Graham or HR. Doc. 78 at ¶ 84. Turner's letter does not address whether it was appropriate to hire Sanders without an onsite interview. Doc. 73-10 at 3-5.

C. **Graham's Alleged Animus**

During St. John's tenure at the Northlake facility, Graham made racially charged comments to him "all the time." Doc. 86 at ¶ 62. Graham would say, "I'm not racist, I have black dishes." *Ibid*. And when St. John spoke in a professional manner, Graham would tell him "that's mighty white of you." *Ibid*.

On several occasions, Graham told Turner that he wanted Turner to fire Russell Cross and Richard Bibbs, who are African-American. *Id*. at ¶ 63. Turner refused because he did not think that there was sufficient reason to fire them. *Ibid*. When Turner, Graham, and Hughes were considering two candidates for a production supervisor position, one white and the other African-American, Graham said that he preferred the white candidate, even though Turner, Hughes, and another employee thought the African-American candidate was more qualified. *Id*. at ¶ 64. Three or four months before Graham fired Plaintiffs, he told them that he "did not stand a chance" romantically with Hughes because he was not African-American. *Id*. at ¶ 61.

Michael Kurucz, a production line manager who reported to Graham, testified that he had a conversation with Graham in November 2017 about potential candidates for a team leader position, one of whom was Sanders. *Id*. at ¶¶ 58-59. According to Kurucz, Graham said that Sanders would not receive the promotion because "she's no different than her no good nigger brother Tyrone[;] he doesn't know when to keep his mouth shut." *Ibid*. (citing Doc. 84-11 at 5-7). Shortly thereafter, Kurucz had a conversation with Graham about a conflict involving some African-American and Hispanic employees, in which Graham told Kurucz to "be careful around these people" and that "it's kind of weird that they're not all sticking together." *Id*. at ¶ 60. According to Kurucz, Graham also compared the culture at the Northlake facility to a bag of

8

M&Ms, explaining that "usually the brown ones stick together, but in this case they're at the bottom of the bag." *Ibid*. Kurucz understood these comments to be racially derogatory. *Ibid*.

According to Turner, Graham occasionally made fun of Jaba "by imitating him using the same type of accent." *Id*. at ¶ 65. Turner heard Graham do so as recently as mid-2015. *Ibid*. Graham also asked Jaba to repeat himself "for no good reason." *Ibid*.

Graham made age-related comments as well. According to Turner, Graham "would say how [Cortes] needed to improve his team. How he needed to get some fresh blood in. How he needed to go into a different direction." Doc. 78 at ¶ 87 (quoting Doc. 73-8 at 37); Doc. 86 at ¶ 67. And months before firing Plaintiffs, Graham responded to Turner's hiring "a seasoned lady supervisor and another gentleman that was potentially going to be a lead" by saying "man, they're old. You need to get some fresh blood in here." Doc. 78 at ¶ 88 (quoting Doc. 73-8 at 37); Doc. 86 at ¶ 66.

### D. Text Messages Acquired After Plaintiffs' Termination

St. John turned over his company phone after he was fired. Doc. 78 at ¶ 82. American Bottling examined the phone and discovered text messages he had exchanged with Sanders and Sellers. *Ibid*. The texts indicate that from September 15-17, 2015, St. John encouraged Sanders and Sellers to quickly complete their employment applications. *Id*. at ¶¶ 35, 37-40; Doc. 86 at ¶ 22; Doc. 73-11 at 52-57. Although St. John wrote that "we had to reopen the job posting for you" and that "I can't keep it open too much longer they are looking for it," Doc. 73-11 at 53, 56; Doc. 78 at ¶¶ 35, 39, he in fact did not have control over how long the posting stayed open, Doc. 86 at ¶ 23. Rather, St. John sent the texts "because Sellers was slow in applying." Doc. 86 at ¶ 22. Hughes does not know whether St. John kept the position open longer than appropriate and did not recall what led her to believe that he had done so. *Id*. at ¶ 21.

At one point during the application process, Sanders texted St. John: "Hey Ty one of the question I just put you as a reference then they ask do I have family work with the company didn't know to say yes or no left it blank til later." Doc. 73-11 at 55; Doc. 78 at ¶ 38. St. John replied: "That fine they are looking at it soon … ." Doc. 73-11 at 55; Doc. 78 at ¶ 38.

After a senior recruiter determined that Sellers did not meet the minimum qualifications for the machine operator position for which he first applied, Sanders texted St. John that she "had [her] second interview" and asked, "[D]o you think they would give me the job and if so what he going to do about [Sellers] are he still going to bring him in though [sic] the temp agency." Doc. 78 at ¶ 43 (quoting Doc. 73-11 at 57). St. John replied, "Yes I will talk to him shortly." *Ibid.* (quoting Doc. 73-11 at 57). St. John followed up a few days later: "Have [Sellers] apply for the sanitation tech it is more money and let me know when it is done." Doc. 73-11 at 58; Doc. 78 at ¶ 44. Hughes testified that St. John was permitted to recommend that Sellers apply for the position. Doc. 86 at ¶ 24.

After Sanders started work, St. John asked how her first day had gone, and Sanders texted: "It was great. … [D]on't worry nobody would ever know we related they very noise [sic] around there I don't do much talking I like my work to speak for itself looking forward to learning more … ." Doc. 73-11 at 60; Doc. 78 at ¶ 50. St. John testified that he had told Hughes that he did not want "the people on the floor" to know he had referred Sanders and Sellers for employment "because he was a manager and did not want anyone to treat them differently because of that." Doc. 86 at ¶ 4.

## Discussion

### I. Liability

As noted, Plaintiffs allege that American Bottling violated Title VII and the ADEA by firing them due to their race and age. Title VII makes it "unlawful … for an employer … to

10

discharge … or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The ADEA "makes it unlawful for an employer … 'to discharge … or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.'" *Carson v. Lake Cnty.*, 865 F.3d 526, 532 (7th Cir. 2017) (quoting 29 U.S.C. § 623(a)(1)). Under the framework set forth in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), an ADEA or Title VII claim survives summary judgment if the plaintiff presents evidence that, considered as a whole, would allow a reasonable jury to find that his protected characteristic caused the adverse employment action. *See Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 719-20 (7th Cir. 2018); *Carson*, 865 F.3d at 532-33.

According to American Bottling, the record indisputably shows that Plaintiffs were fired because its decisionmakers honestly believed, based on Hughes's investigation, that Plaintiffs violated company hiring policies and practices and lied about it during the investigation. Doc. 72 at 2. Plaintiffs respond with record evidence suggesting that the investigation was a pretext to cover up Graham's discriminatory motives—specifically, that Graham knew about St. John's relationship with Sanders and Sellers, authorized St. John to refer them for employment, and authorized Turner to conduct phone interviews instead of onsite interviews, but then turned around and reported that very conduct to HR, withheld from the investigators the fact that he had authorized that conduct, and invoked the results of the investigation as an excuse for firing Plaintiffs. Doc. 79 at 6, 15. A jury need not reach those conclusions, but it reasonably could on the present record, which means that American Bottling is not entitled to summary judgment. *See McKinney v. Office of the Sheriff of Whitley Cnty.*, 866 F.3d 803, 810-13 (7th Cir.

11

2017) (holding that the plaintiff's evidence, including his own testimony, that "he was fired for conduct that supervisors expressly authorized" supported an inference that his employer's stated rationale for firing him "was not merely mistaken but dishonest"); *Harden v. Marion Cnty. Sheriff's Dep't*, 799 F.3d 857, 865 (7th Cir. 2015) (noting that summary judgment is inappropriate where the jury could find "that the relevant decisionmaker[] … did not legitimately rely on the investigator['s] conclusions in terminating" the plaintiff).

American Bottling counters that no reasonable jury could believe Plaintiffs' version of events because it is "based solely on their own deposition testimony" and contradicted by Hughes's contemporaneous notes of what they told her during the investigation, Turner's December 2015 letter, and St. John's text messages. Doc. 85 at 9-10. That is an argument for the jury, not for the court on summary judgment. *See Johnson*, 892 F.3d at 893 ("As we have said many times, summary judgment cannot be used to resolve swearing contests between litigants.") (internal quotation marks omitted); *McKinney*, 866 F.3d at 814 ("[T]he [district] court was wrong to discount McKinney's testimony as 'self-serving, speculative, and conclusory.' Our cases for at least the past fifteen years teach that [s]elf-serving affidavits can indeed be a legitimate method of introducing facts on summary judgment.") (some internal quotation marks omitted); *Rasho v. Elyea*, 856 F.3d 469, 477 (7th Cir. 2017) ("[The plaintiff's] credibility and the weight to be afforded his testimony is a matter for a jury to decide."). In any event, the evidence cited by American Bottling, viewed in the light most favorable to Plaintiffs, does not necessarily contradict their testimony. Plaintiffs deny the accuracy of Hughes's notes—and question whether she took contemporaneous notes at all. Doc. 78 at ¶¶ 61, 68, 78. And St. John's texts (whose meaning the parties genuinely dispute) and Turner's letter do not directly contradict Plaintiffs' deposition testimony.

A reasonable jury also could find that Hughes's belief that Plaintiffs lied during the investigation, even if honestly held, was not the real reason Graham fired them. For starters, a jury could infer from Graham's using as a pretext some of the investigation's findings (Plaintiffs' alleged violations of American Bottling's hiring practices) that his invoking other findings (Plaintiffs' alleged dishonesty during the investigation) was also pretextual. *See Simpson v. Beaver Dam Cmty. Hosps., Inc.*, 780 F.3d 784, 798 (7th Cir. 2015) (noting that "the pretextual character of one" asserted ground for the employer's decision may be "so fishy and suspicious" as to support an inference that the other asserted grounds were also pretextual, particularly where the grounds were "intertwined") (internal quotation marks omitted). Additionally, a reasonable jury could infer from Graham's launching an investigation into conduct he had approved that he had already decided to terminate Plaintiffs, and thus that his decision was not based on what he later came to believe about their honesty. A reasonable jury also could believe multiple witnesses' recollections that Graham finalized the decision to terminate Plaintiffs during the November 24, 2015 conference call, Doc. 86 at ¶ 9, at which point Hughes and Ferguson still had not conducted the final interview that led them to believe that Turner was being dishonest, Doc. 78 at ¶ 79; Doc. 86 at ¶¶ 8, 10-11. Finally, Plaintiffs' termination letters—which Graham signed—do not mention the alleged dishonesty. Doc. 78 at ¶ 80; Doc. 73-11 at 61-62.

American Bottling contends that the dispute over *when* Graham decided to fire Turner is immaterial because witnesses' conflicting recollections of "how and when the termination decision was reached" do not prove pretext. Doc. 85 at 15-16 (internal quotation marks omitted). True, the Seventh Circuit has "held that where there is no conflict in the evidence regarding the reasons for an adverse employment action, differing recollections of the events surrounding that action do not raise a reasonable inference of discrimination." *Bagwe v. Sedgwick Claims Mgmt.*

*Servs., Inc.*, 811 F.3d 866, 881-82 (7th Cir. 2016) (internal quotation marks omitted). Here, however, the disagreement about what happened on the conference call is itself a "conflict in the evidence regarding the reasons for" Plaintiffs' firing. *Ibid*. A reasonable jury could infer from the timing of Graham's decision to fire Plaintiffs that he terminated them for reasons other than their alleged lack of candor during the investigation.

That leaves the question whether the summary judgment record would permit a reasonable jury to find that Graham's real reason for terminating Plaintiffs was their race or age. It would. Plaintiffs adduce evidence (which the jury may or may not believe) that Graham (1) made racially derogatory comments to Plaintiffs; (2) talked about the "need to get some fresh blood in here," including in connection with Turner's hiring of people Graham called "old"; (3) replaced Plaintiffs, African-American men in their late 40s, with white men nearly two decades younger; and (4) continued to make racially derogatory comments at work after Plaintiffs were fired, including calling St. John a "no good nigger." Doc. 78 at ¶ 87; Doc. 86 at ¶¶ 52-54, 57, 59-62, 66-67. That evidence, when considered along with the evidence suggesting that Graham used Hughes's investigation to launder his true intent, would permit a reasonable jury to conclude that Plaintiffs' protected characteristics, race and age, "caused the[ir] discharge." *Ortiz*, 834 F.3d at 765; *see also Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1021 (7th Cir. 2016) ("The jury could reasonably conclude that SigmaTron's stated reason for the termination was a pretext, and it was then free to infer that the company gave a false reason in order to cover up a discriminatory purpose.").

American Bottling dismisses Graham's comments as "stray remarks" that "are insufficient to create an inference of discrimination" because they were not made in connection with Plaintiffs' termination. Doc. 85 at 12-13 (citing *Teruggi v. CIT Grp./Capital Fin., Inc.*, 709

F.3d 654, 661 (7th Cir. 2013), *abrogated in part by Ortiz*, 834 F.3d 760). But the question here is not what the comments, standing alone, prove, but rather what a reasonable jury could conclude when the evidence is put "in a single pile and … evaluated as a whole." *Ortiz*, 834 F.3d at 765-66 ("Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself … ."); *see also Freelain v. Vill. of Oak Park*, 888 F.3d 895, 905 (7th Cir. 2018) ("*Teruggi* … did not set boundaries for weighing circumstantial evidence as part of a larger case. … We repeat our caution that courts should not discard circumstantial evidence simply because it does not provide direct proof of unlawful intent.") (emphasis omitted). As explained above, the evidence taken as a whole would allow a reasonable jury to find that discrimination was afoot.

American Bottling also argues that Graham's comments about "old" employees and "fresh blood" "do not suggest discriminatory intent" based on age. Doc. 72 at 21-22; Doc. 85 at 18. In support, it cites *Beatty v. Wood*, 204 F.3d 713 (7th Cir. 2000), for the proposition that "case after case confirms" that a "reference to 'new blood' does not evidence age-based discrimination." Doc. 72 at 21-22 (some internal quotation marks omitted). But *Beatty* held only that a reference to "new blood" did not, "*in isolation*, evidence age-based discriminatory animus," and added that, "in some contexts, it might well be indicative of age discrimination, but there was absolutely no evidence produced in this case to provide such a context." 204 F.3d at 716 (emphasis added). The context missing in *Beatty* is present here. Taking Graham's comments in their context—a conversation about Turner's hiring older employees, followed a few months later by Graham's firing Plaintiffs for reasons a jury could find were pretextual and replacing them with much younger employees—a reasonable jury could find that Plaintiffs' age caused their termination. *See Ortiz*, 834 F.3d at 765-66; *see also Blackwell v. Cole Taylor Bank*,

15

152 F.3d 666, 671-72 (7th Cir. 1998) (noting that remarks about "fresh blood" can be "evidence of age discrimination").

## II. Back Pay

American Bottling also argues that the after-acquired evidence doctrine defeats Plaintiffs' request for back pay. Doc. 72 at 22-23. Although "information that surfaced after the discharge … cannot absolve" American Bottling from liability, it "may reduce [Plaintiffs'] damages" under the after-acquired evidence doctrine. *Ortiz*, 834 F.3d at 766. The doctrine provides that if an employer discharges an employee because of a protected characteristic, but later "turns up evidence of employee wrongdoing which would have led to the employee's discharge, then the employee's right to back pay is limited to the period before the discovery of this after-acquired evidence." *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1047 (7th Cir. 1999).

American Bottling contends that St. John's text messages, which it acquired hours after the firing, establish that Plaintiffs in fact engaged in the misconduct for which they were fired. Doc. 72 at 23. That argument fails at summary judgment because there are genuine disputes in the record as to what the texts mean and whether American Bottling would in fact have terminated Plaintiffs for the conduct the texts describe.

American Bottling asserts that the texts establish that St. John: (1) reopened a job posting for Sanders and Sellers; (2) "talked to Turner about whether Sanders would be hired"; and (3) "intentionally concealed his relationship" with Sanders and Sellers. *Ibid*. That reading of St. John's texts is not inevitable. First, a reasonable jury could believe St. John's explanation of the texts about reopening and holding open the job posting: He lacked power to do those things and was merely trying to encourage Sanders and Sellers to stop procrastinating and submit their applications. Doc. 78 at ¶¶ 35, 39; Doc. 86 at ¶¶ 21-23. Second, American Bottling cites St. John's "Yes I will talk to him shortly" text as proof that he in fact talked to Turner about

Sanders. Doc. 72 at 23 (citing Doc. 78 at ¶ 43). But that text responded to a compound question in which Sanders asked (1) "do you think they would give me the job" and (2) "if so what he going to do about Melvin are he still going to bring him in though [sic] the temp agency." Doc. 78 at ¶ 43 (quoting Doc. 73-11 at 57). The court cannot definitively conclude on the summary judgment record who St. John meant by "him," much less whether he followed through on his stated intention. Third, a reasonable jury could believe St. John's testimony that he in fact disclosed to Graham and Hughes his relationship with Sanders and Sellers, and that the concern to which Sanders alluded when she said "don't worry nobody would ever know we related" was that "people on the floor" would give them special treatment. Doc. 73-11 at 60; Doc. 78 at ¶ 50; Doc. 86 at ¶¶ 2-4.

What is more, because a reasonable jury could conclude that Graham authorized Plaintiffs' conduct and did not in fact terminate them for the reasons he gave, it is open to question whether, had American Bottling found out about the text messages earlier, it would in fact have responded by firing Plaintiffs. *See Sheehan*, 173 F.3d at 1047-48 (holding that the employer failed to satisfy its burden of proof on its after-acquired evidence defense where "no one in the history of [the company] had ever been fired for" the misconduct at issue, and where the defendant adduced no evidence "that the policy [permitting termination for that misconduct] actually would have been applied"); *see also McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 362-63 (1995) ("Where an employer seeks to rely upon after-acquired evidence of wrongdoing, it must first establish that the wrongdoing was of such severity that the employee *in fact would have been terminated* on those grounds alone if the employer had known of it at the time of the discharge.") (emphasis added); *Cuff v. Trans States Holdings, Inc.*, 768 F.3d 605, 609 (7th Cir. 2014) (holding that the after-acquired evidence doctrine limits damages "if the

employer *would have fired* this employee, in particular, on learning of the worker's misconduct") (emphasis added).

Given the foregoing, American Bottling is not entitled to summary judgment under the after-acquired evidence doctrine on Plaintiffs' request for back pay.

**Conclusion**

American Bottling's summary judgment motion is denied. American Bottling's original motion to bar part of Turner's deposition testimony is denied as moot in light of its filing the renewed motion to bar and strike. The renewed motion to bar and strike is denied to the extent noted above and otherwise is denied as moot, as disregarding the challenged testimony and the remaining challenged portions of Plaintiffs' Local Rule 56.1(b)(3)(B) response would not change the outcome of the summary judgment motion.

February 26, 2019

　　　　　　　　　　　　　　　　　　United States District Judge